SWIFT *et al.* *v.* TATNER.

1. The owner of a majority of shares in a ship may control and navigate or charter out the ship, and his co-owners will be bound by his acts and contracts and by all the liabilities incurred by the ship in due course of trade, unless they expressly dissent from the employment to which she is put by the majority owner. Minority owners can protect themselves against such liabilities only by dissenting and by requiring the majority owner to give bond and security for the safe return of the ship.

2. A contract for the carriage of goods by sea will not be construed as a lease or demise of the ship, by which the owner surrenders

all control of her navigation to the charterer, but will be construed as a contract of affreightment binding the ower to perform certain services with his ship, unless the intention to transfer the possesion and ownership is unequivocally manifested by the contract. A charter-party which contains matter only of contract, stipulating that the ship shall, within a specified time, perform certain voyages with certain cargoes, and the captain make proper delivery of the cargo, freight in a fixed sum to be paid each trip upon delivery of the cargo in the charterer's port; reserving a lien for freight on the cargo in favor of the captain or owners, and sufficient room in the ship for tackle, etc., officers and crew; and providing that the ship shall carry on any outward trip lumber or such cargo as charterer desired free of freight charge, the charterer not undertaking to man or victual the ship or to bear any risks or expenses of the voyage, constitutes a contract of affreightment and not a lease of the ship. The captain or master in such case would be a servant of the owner rather than of the charterer.

3. If the master of a ship be without fault during a period of detention resulting from seizure of the ship by legal process, he is entitled to wages on the terms of his contract, unless the contract stipulates to the contrary.

4. If the master of a ship neglect to collect of the charterer freights which it was his duty to collect, in which he had an interest and for which both himself and owner had a lien upon the cargo, he cannot make the owner respond for his interest unless the owner was instrumental in preventing payment by the charterer.

5. In order for the plaintiff to obtain a verdict against all the defendants in an attachment sued out against several persons as joint owners of a ship, he must establish by evidence the joint ownership as alleged, notwithstanding the defendants have replevied the ship after its seizure under the attachment. The right to replevy being given by statute to the defendants as such, irrespective of their ownership of the property, no admission by them of the plaintiff's demand, or of their ownership at the time the demand accrued, is implied in the act of giving a replevy bond.

6. There being no evidence to uphold the action as against some of the defendants, all charges of the court based upon the theory that there was such evidence were erroneous.

August 23, 1892.

Shipping. Carriage by sea. Contract. Master and servant. Verdict. Evidence. Before Judge HARDEN. City court of Savannah. November term, 1891.

Action by Tatner against Swift, Adams and others as owners of the schooner Leon S. Swift. The jury

found $651.55 for the plaintiff generally. The defendants moved for a new trial, which was denied, and they excepted. For the other material facts see the opinion.

DENMARK, ADAMS & ADAMS, for plaintiff in error.

R. R. RICHARDS and D. GRIFFIN, *contra.*

SIMMONS, Justice.

A ship belonging to several owners in common was chartered by one of them, who owned a majority of shares, to a merchant to sail between specified ports during a term not to exceed six months. It was arranged between owner, charterer and master that the charterer should pay a certain amount of freight upon the completion of each return voyage and delivery of the cargo in the charterer's port, of which amount the master should receive two thirds to reimburse him for expenses of manning and victualling the ship, etc., and to pay for his services as master, the remaining third, less expenses for repairs, etc., to go to the ship, that is the owners. Part of this arrangement was embodied in the charter-party, and a part of it appeared in the oral testimony introduced on both sides. Pending the performance of the charter-party the ship was seized in the charterer's port under an attachment for a personal debt of the majority owner, and not being replevied by him or the other owners, was detained and thus prevented from making one or more voyages in pursuance of the contract. The master now sues all the owners in an attachment levied on the ship, for damages on account of being prevented by the first attachment and failure to replevy from making voyages which he could have made had the ship been free, and also for his expenses and wages during the delay, and for his share of the charter money of one voyage actually made, which he alleges that the owners prevented him from collecting.

1. The first question respects the liability of those

owners who did not join in the charter-party or the collateral agreement with the master. The court charged the jury thus : " If you find from the evidence that Tatner had an arrangement with Swift as the managing owner whereby he, Tatner, was to represent the vessel and owners under certain circumstances and for certain purposes, and if you find that the other owners made no objection to this arrangement, and that they received the charter money or any portion of it without objection, then this arrangement would be just as binding upon them as upon Swift, and whatever Tatner was authorized to do under his arrangement with Swift would be equally binding upon all of the owners." " Hence the question is . . . whether Tatner has a claim against Swift and the other owners of the vessel ; if he has, then his claim extends to all of those whom you find to be owners of that vessel." It is complained that these instructions were erroneous, and also that the court failed to instruct with reference to the defendants' contentions that there was no privity between them and the master ; that none of them, except Swift, could be liable on account of the ship's detention under the attachment, they being not liable for the debts of Swift or for the action of his creditors, over which they had no control ; and that they were not liable for the breach of the charter-party or the acts of Swift, or for the wages of the master. It may be observed that, if special instructions were desired as to the different defendants who were making a common defence, they ought properly to have been requested. But since the charges given were excepted to, and as there is to be a new trial for another reason, it is well to state the principle governing the liability of the minority owners. Swift testified that he owned thirty-nine sixty-fourths of the ship at the time of the charter. He was thus a majority owner. The rights of a majority owner are

very large. It is to the interest of all the owners, and of the public, that the vessel be kept in trade and not be forced to lie idle because the owners may not agree on her employment. Therefore the majority owner is entitled to the possession and management of the ship. And the minority owners, unless they expressly dissent, are held to acquiesce in and be bound by the acts and doings of the majority owner. He represents them as their agent, they having the right and duty to share ratably in the profits and losses of the joint enterprise. He does not need their express authority in order to bind them, but they need to expressly withdraw their authority in order not to be bound. They can avoid liability. and loss in any particular venture of which they do not approve, by requiring the majority owner to give bond for the safe return of the ship. Abbott on Shipping (13th Eng. ed.), 85 *et seq.*, 90 *et seq.*; Carver on Carr. by Sea, p. 40 ; 1 Pars. Ship. & Adm. 95, 97 ; Desty, Ship. & Adm. §§36, 37, 47 ; 23 Myer's Fed. Dec. §1166 *et seq.* Thus the minority owners, unless they dissent from, are presumed to agree to the voyage and all the liabilities occasioned by it, and the burden is on them to show their dissent and consequent non-liability when its exists. Under this principle, it may be said, in a general way, that the minority owners of the ship in question are bound by the charter-party and by any agreement which the majority owner may have made with the master for his employment and compensation, and by any acts or omissions of the majority owner which affected or determined the peformances of the ship. This is certainly true of those who were owners at the time the contract was made, and they could not divest themselves of liability by parting with their interest in the ship, unless perhaps the credit were given entirely to the ship ; for a party cannot thus shift his contract on to another to whose responsi-

bility the opposite party might not be able or willing to trust.    As to owners who became such after the contract was made, the evidence furnishes only one example, the defendant Adams.    He figures first as the assignee in bankruptcy of Swift, and afterwards as owner of the ship.    In the former capacity he received one payment of the ship's share of the charter money and became so connected with her subsequent detention as to gain a knowledge of all the circumstances.    When he afterwards acquired his interest, whatever it is, he had notice of the outstanding engagement of the ship and of the liability of the owners to make good the time lost by the delay.    Besides, the jury might be warranted in finding from his admissions in the letter of February 20th, 1890, in which he said he was then sole owner, and in the letter of February 26th, in which he said he owned fifty-nine sixty-fourths of the vessel and was more interested than any one to have the vessel clear, and from other correspondence and all the circumstances, that he was owner for part of the time of delay and was actually responsible to some extent for the tardiness with which the bond was given and the ship released. Indeed he seems to have been the chief actor on the owner's side all through the complication which detained the ship, but how long as assignee of Swift and how long as owner is not clear.    There may be little doubt that one who was part owner at the time of the occurrence causing the damage sued for would be represented by the then majority owner, or the managing owner, and liable for his acts and defaults touching the operation of the ship.    And one buying after the breach of contract might be bound for the damages, at least to the extent of his interest in the ship.    But it is not intended to rule these questions now, because the evidence does not show when the defendants, with the exception of Swift and Adams, acquired their interest,

or that they ever had any at all. If either party de-
sired a decision on these points, he ought to have shown
when the various defendants acquired their ownership.
The court below could not properly charge on mere
assumptions, nor can exceptions for review be predi-
cated on a purely hypothetical state of facts.

2. One of the principal questions argued before us
was, whether the master in this case was in the service
of the owners or of the charterer. And as helping to
solve that question, the charter-party was claimed by
the defendants to be a lease of the vessel to the char-
terer whereby he acquired entire possession and control
of her navigation, thus becoming the owner *pro hac vice*,
while the plaintiff claimed that it was only a contract
of affreightment by which the owners did not transfer
possession and ownership *pro tempore* to the charterer,
but retained control of the ship's navigation. In decid-
ing which contention is correct, the contract, where it
does not speak conclusively, may be construed in the
light of maritime custom. In the first place, the mas-
ter is usually employed by the owners and is their ser-
vant or agent; and so if the charterer in this case did
not become owner, there would be a presumption that
the master was employed by Swift. Fenton *v.* Dublin
Steam Packet Co., 1 Per. & Dav. 103. Again, leases
or demises of the ship are rare in comparison with con-
tracts of affreightment. The law deems it imprudent
for an owner to surrender the management of his ship
to a charterer. Hence if it is doubtful on the face of
the charter-party whether it was intended to clothe the
charterer with ownership, the presumption is against
such an intention. As between the two possible con-
structions, the law favors and inclines to the contract
of affreightment. Abbott on Ship. *289; Desty, Ship.
& Adm. §204; The Aberfoyle, Abb. Adm. 242; Cer-
tain Logs of Mahogany, 2. Sumn. 599; Hagar *v.* Clark,

78 N. Y. 43; Reed *v.* United States, 11 Wall. 591; McGilvery *v.* Capen, 7 Gray, 523. Keeping the presumptions in mind, the terms of the charter-party may now be looked to. The first indication of a retention of ownership by the owners is that there are no words of lease or transfer. It is merely stipulated that the vessel, whereof A. W. Tatner is master, shall render certain services. "The whole instrument contains matter of contract and covenant only." Saville *v.* Campion, 2 B. & Ald. 503; Sandeman *v.* Scurr, L. R. 2 Q. B. 86; The Aberfoyle, Abb. Adm. 242; The Volunteer, 1 Sumn. 551; Hagar *v.* Clark, 78 N. Y. 43. In view of the presumptions and the context, it must be the owner who stipulates that "the vessel shall proceed to Portland and load lumber for Baracoa and from there load fruit for Savannah," etc.; that "the vessel being so laden, Captain A. W. Tatner shall with all possible dispatch make sail for the port of Savannah and there make a true and faithful delivery of the cargo," etc. By stipulating for its performances the owner evinces the intention of running the ship himself, that is of keeping control. After agreeing to deliver the cargo, the contract proceeds: "In consideration whereof, freight shall be paid on unloading and right delivery of the cargo at Savannah in the sum of six hundred and fifty dollars per round trip, charter money being payable each trip upon delivery of cargo." Note that the compensation termed "freight" is payable on delivery of the cargo in the charterer's port. It would be senseless for either party to contract with the other that the charterer should deliver the cargo to himself. The sense of it is that the charterer pays the freight when the owner delivers the cargo, this delivery being a condition precedent of receiving the charter money. All this shows that the owner meant to retain ownership and control. Abb. Ship. *291; Campion *v.* Colvin, 3

Bing. N. C. 17; Certain Logs of Mahogany, 2 Sumn.
599; The Nathaniel Hooper, 3 Sumn. 544; Hooe v.
Groverman, 1 Cranch, 214; McGilvery v. Capen, 7 Gray,
523. Moreover it is agreed that "the captain or owners
of the vessel shall have an absolute lien on the cargo
for all freight, dead freight, and demurrage, average
and other charges." This reservation of lien comports
much better with the retention than with the resigna-
tion of possession by the owner. If the master navi-
gating the ship was to be the servant of the charterer,
how could the master have any such lien, and would
not the owner's lien be, if not impossible, at least prac-
tically ineffectual? That the captain or owners shall
have the lien, indicates that both these parties are
opposed in interest to the charterer. Again, it is pro-
vided that the vessel shall load certain cargoes "which
shall not exceed what she can reasonably stow and
carry over and above her tackle, apparel, provisions and
room sufficient for the accommodation of the officers
and crew." This reservation of space in the ship is
another indication that the owner's possession continued.
Saville v. Campion, 2 B. & Ald. 503; Gilkison v. Middle-
ton, 2 C. B. N. S. 134; Omoa Coal Co. v. Huntley, L. R. 2
C. P. D. 464; The Aberfoyle, Abb. Adm. 242; The Vol-
unteer, 1 Sumn. 567; The Nathaniel Hooper, 3 Sumn.
544; Clarkson v. Edes, 4 Cow. 470; McGilvery v.
Capen, 7 Gray, 523; Hagar v. Clark, 78 N. Y. 43. It
is further stipulated that the vessel "shall carry on any
outward trips lumber or such other suitable cargo as
charterer may desire free of freight charge." This evi-
dently means that the owner will carry such cargo
without charge. For, if the ownership was *pro tempore*
in the charterer, it would be unnecessary for him to
guard against any liability to pay freight on an outward
voyage; he could not be made to pay for carrying his
own cargo in his own ship. There is nothing in the

contract to show that the charterer was to employ and pay the master and crew. From this it would be implied that the owner had it to do. Hagar v. Clark, 78 N. Y. 43. But the owner expressly represents that the vessel already has a master in the person of Tatner, and that she is "in every respect fitted for the intended voyage." This could not be true unless she were properly manned. Indeed, it may be said that a vessel is not seaworthy without a proper complement of officers and crew. Carver on Carr. by Sea, §18. The services of an intelligent and adequate force to manipulate the ship are certainly necessary for her safe navigation. Under the contract, then, the owner was bound to provide the master and crew. Tatner testified: "I went with my crew all ready to take charge of the vessel, got the vessel ready for sea and had the charter-party signed." Also: "An agent or owner of a vessel will not charter his vessel unless he knows who the captain is that is to have charge of her. It is customary in cases of time charters like this, for the captain to man and victual the vessel and collect all the charter money and take his share out and remit to the owners their share. . . . I saw Mr. Swift and asked him for the vessel; he enquired if I wanted her, and I replied that I did; and he said that if you will go master of her, I am willing to put her in the fruit trade." Also that, as master in charge, he represented the vessel and owners. The testimony of Swift does not harmonize with the charter-party, and is contradicted by Tatner and Collins both. Swift said, after naming the amount of the charter money, "From that amount Collins was to pay the owners of the Leon S. Swift one third clear. The other two thirds he was to reserve to pay his captain (Tatner) and his crew, and for victualling the vessel. Neither myself nor the other owners of the vessel had anything to do with appointing or employing Tatner; he

was appointed and employed by Collins. . . . J. S. Collins employed the crew of said vessel during time said charter-party was in operation, and he paid them. Collins paid for and was to purchase all provisions for officers and crew, and also supplies for the vessel, and to defray its running expenses; all the owners were to pay for was sails, rigging, painting, and generally keeping the schooner in order." Collins testified: " Of course we cannot charter a vessel from an owner without getting some one as master who is experienced in the fruit trade and who will therefore be acceptable to the owners. . . . I had nothing to do with employing the crew or victualling the vessel. I paid the charter money as stated, and out of that the captain from his share manned and victualled the vessel." All agreed that Tatner had originally gone forth for Collins in search of a vessel. But the charter-party being the best evidence of the relation of the master to the other parties in the arrangement, it all amounts to this, that Tatner was acceptable to the owner as well as to the charterer, and was adopted as master by the former, and consequently was in the service of the owner or owners.

3. Having determined that the master was in the service of the owners, the next question is, ought he to recover from them the damages he sustained by the detention of the ship under the attachment issued against the majority owner? When the ship was seized under legal process, it became the duty of the owners at once to release her by giving the requisite bond and security. It seems that the master as such would have no right to give the bond and thereby bind the owners, at least where it is practicable for him to communicate with them. See Gager v. Babcock, 48 N. Y. 154, 8 Am. Rep. 532; Mitchell v. Chambers, 38 Am. Rep. 167. Consequently, the master having notified the majority owner at once of the ship's seizure, it was not the master's duty to re-

plevy her.   The charterer was not obliged to do so, in the absence of a contract requiring it.   The owners, by undertaking that the ship should go, contracted that she should be free to go.   There was a sort of warranty that she should not be detained by circumstances which they could control.   Indeed there is some authority that an absolute undertaking of this sort will not be discharged by a supervening impossibility.   But it is not necessary in this case to go so far.   The seizure under the attachment was not such *vis major* as to excuse the owners from performing their contract.   See Van Beuren *v.* Wilson, 18 Am. Dec. 491.   They do not show, or even claim, that they were unable to give the necessary bond, nor do they offer any explanation of the delay to do so.   It may therefore be assumed that they or some of them were able to replevy the ship, and they cannot plead impossibility by act of the law as releasing them from liability.   Indeed it may be doubted, if they were unable to replevy the ship, whether that would be any excuse, since the necessity was brought on by the act or omission of the majority owner.   If the majority owner failed to give the bond, then the other owners, in order to avoid the consequences, ought to have come up and given it.   While the ship was being detained, the charterer was urged to replevy her, and a witness or two expressed the opinion that it was his duty to do so.   But while the charterer might have done so, perhaps, to save himself from loss, it was not incumbent on him to take a burden and risk which his contract did not put upon him.   We think that the master, being without blame for the delay, is entitled to recover of the owners.   The contract with him provided that he should get two thirds of the charter money of each voyage and bear the expenses of manning and victualling the ship.   This was nothing more than a convenient mode of meeting these expenses and providing com-

pensation for his services. Sometimes a master who is to get a share of the profits will hold the relation of partner to the owners, sometimes being owner for the voyage himself. However, "the cases are numerous which show that the taking a vessel by the master, victualling and manning her and paying a portion of the port charges and having a share of the profits, do not of themselves constitute him the owner *pro hac vice.* . . . The expense of victualling and manning the vessel, and receiving compensation for his services and disbursements in a share of the profits by the master, are by no means inconsistent with the right of the employer or owner to have the general direction of the business in which she is engaged." Lynan *v.* Redman, 23 Me. 289,295; Latham *v.* Lawrence,13 Conn. 299; Sims *v.* Howard, 40 Me. 276; Arthur *v.* The Cassius, 2 Story, 81; The Nathaniel Hooper, 3 Sumn. 544; Harding *v.* Souther, 12 Cush. 307; Steel *v.* Lester, L. R. 3 C. P. D. 121. Under these authorities, the arrangement disclosed by the charter-party and the testimony in this case did not make the master owner for the voyage or voyages, but was only a contract for his wages as master. And unless his contract so stipulated, his right to wages would not be extinguished or suspended by a detention of the ship without his fault, and a failure of the owners to allow him to go on performing his services, he being ready and offering to do so.

4. The evidence shows that the charter money for one voyage was never paid over, but was retained by the charterer. The charterer said his reason for retaining it was twofold: first, because he had been notified by Adams not to pay it over to Tatner, and second, because he thought he had a lien on it for his damages by reason of the attachment of the ship. Adams denied giving any such notification, but Tatner said Collins, the charterer, would not pay because Adams had notified him not to.

The charter-party gave the captain and owners a lien on the cargo for the charter money or freight, and Tatner could have retained the cargo until the freight was paid. If he chose to surrender the cargo without requiring the payment of the freight, then his intention was to credit the charterer, and he thereby waived any claim he might have had against the owners for his interest in the freight money of that voyage. And so long as it remained uncollected by the owners, he could not recover his share from them. But of course, if the owner interfered to prevent payment to the master or influenced the charterer to refuse payment, then the owner would be a party to such refusal, and liable accordingly.

5. A number of the defendants were not shown to have any interest in the ship at any time, though the verdict and judgment was general against all the defendants. The defendant in error contended that the jury could base their finding on the fact that all the defendants joined in the replevy bond and in the defence to the action. As concerns the bond, our attachment law gives to defendants the right to replevy regardless of any interest of theirs in the property attached. Consequently no admission of ownership or interest in the property can be implied from the simple act of replevying it. As to defending the action, it is obvious that appearance by a defendant will not supply the place of proving a material averment. In order to recover, the plaintiff would have to make out a *prima facie* case, if there were no appearance at all. Appearing and pleading the general issue is not a confession of judgment, but puts the plaintiff on proof of his case. There was no offer to amend the declaration in this case by striking out some of the defendants, but the declaration, verdict and judgment were against all defendants as joint owners of the ship. The plaintiff having failed to prove the joint ownership as alleged, and that being the founda-

tion of liability as to certain of the defendants, and this being an attachment case, the court erred in not granting a new trial for the want of evidence to uphold the joint verdict.

6. The last head-note explains itself.

*Judgment reversed.*