## THE TONGOY.[1]

### LIGHTBURNE et al. v. THE TONGOY.

#### (District Court, S. D. Alabama. March 25, 1893.)

1. SHIPPING—CHARTER PARTY—MASTER TO SIGN BILLS OF LADING.

Where the charter party required the master to "sign shippers' bills of lading as presented without prejudice to the charter party," he is bound to sign any usual bill presented describing goods actually delivered to the vessel, and a refusal to do so is a breach of the charter party, which entitles the shipper to such damages as may be shown; but such provision does not require the master to sign erroneous bills, and seek subsequent redress for shortage.

2. SAME—CHARTER PARTY LIBERALLY CONSTRUED.

The construction of such contracts as charter parties should be liberal, agreeable to the real intention of its parties as ascertained from the whole instrument, and conformable to the usages of the trade concerned.

3. SAME—BILL OF LADING—DEFINITION.

A bill of lading is both a written acknowledgement, signed by the master, that the vessel has received from the shippers the goods therein described, and a promise to transport and deliver them on the terms therein expressed.

4. SAME—AGREEMENT AS TO CONCLUSIVENESS OF BILLS OF LADING.

A provision in a charter party that "bills of lading are to be binding upon master and owners as proof of quantity delivered to the ship," makes the bills not only prima facie, but conclusive, evidence on that point.

5. SAME—MASTER CANNOT VARY TRUE BILLS OF LADING.

When true bills of lading are presented the master cannot make any indorsement impairing their negotiability, but he may, before signing, indorse a correction of any errors in bills of lading presented to him.

6. SAME—ACCEPTING BILLS OF LADING UNDER PROTEST.

Shippers do not prejudice their right to redress by accepting under protest bills of lading wrongly indorsed by the master.

In Admiralty. Libel in rem by shippers to recover damages for breach of charter party in that the master, before signing bills of lading, which he claimed were incorrect, indorsed on them that a certain amount of cargo was in dispute. The shippers accepted the bills under protest, and then libeled the vessel. Heard on the merits, and libel dismissed.

G. L. & H. T. Smith, for libelants.
John E. Mitchell and Pillans, Torrey & Hanaw, for claimants.

TOULMIN, District Judge. The libelants sue for a breach of a charter party made in London, Eng., on the 22d of October, 1892.

[1] Reported by Peter J. Hamilton, of the Mobile, Ala., bar.

The charter party contains, among other things, the following stipulations:

"The master shall sign shippers' bills of lading as presented without prejudice to this charter party, but any difference in freight shall be settled on signing bills of lading. * * * Bills of lading are to be binding upon master and owners as proof of quantity delivered to the ship; the master's signature to be in all cases binding upon owners."

The charterers were the shippers, and the cargo consisted of deals and boards. The breach of the charter party alleged is that the master refused to sign bills of lading as presented by the shippers, unless there was expressed thereon, "seventeen hundred and seventy-five pieces in dispute, all on board to be delivered." The master refused to sign the bills of lading as presented for the quantity of lumber specified therein, on the ground, as he stated at the time, that he had not received that number of pieces; that the number of pieces delivered to and received by him was 1,775 less than the number named. Libelants were at first unwilling to have said indorsement made on the bills of lading, and did not consent thereto, but subsequently consented, and received from the master the bills of lading signed in the form proposed by him, but did so under protest.

The libelants then brought this suit to recover damages alleged to have been sustained by them by the master's refusal to sign the bills of lading as presented. The parties to the contract stipulated in the charter party, as they had the right to do, that the master should sign bills of lading as presented, without prejudice to the charter party. When this is the case the master is bound to sign any usual and ordinary bill of lading presented to him, and his refusal to do so is a breach of the charter party, and gives a right to damages, if any are shown. Scrutton, Charter parties, p. 45; Macl. Shipp. p. 408. But the master cannot be required to sign bills of lading unless the goods have been delivered. His authority to give bills of lading is limited to such goods as have been put on board. Carter, Carr. 156–161. The contention on on the part of libelants here is that, under the contract in this case, the master was bound to sign any bills of lading presented by the shippers in good faith, whether the quantity of lumber specified in the bills of lading had actually been received by the master or not; in other words, he was bound to sign at all events, and if it thereafter appeared that the quantity of lumber receipted for had not been actually received, the owners or master of the vessel must seek such redress as might then be available. With this contention of the able counsel for the libelants I cannot agree. My opinion is that, under the clause in the charter party providing that the master shall sign shippers' bills of lading as presented without prejudice to the charter party, he is not compelled to sign bills of lading without reserve. He is not compelled to sign them for a specified quantity of cargo unless it is actually measured or counted into the ship. I think the meaning sought to be given to the clause referred to is too literal, too restricted.

The general rule is that the construction of contracts of this

character should be liberal, agreeable to the real intention of the parties to it, and conformable to the usages of trade in general, or of the particular trade to which the contract relates.   1 Pritch. Adm. Dig. p. 473, § 37.   To ascertain such intention we should look to the whole contract, and not to a single part of it.   2 Pars. Cont. 13.   We should consider the nature of a bill of lading, and, construing the contract conformably to the usage of the particular trade, determine the rights and obligations of the parties to it.   Now, a bill of lading is a written acknowledgment, signed by the master, that he has received the goods therein described from the shippers, to be transported on the terms therein expressed. It is a receipt for the quantity of goods shipped, and a promise to transport and deliver them as therein stipulated.   The Delaware, 14 Wall. 579.   Can it be justly or reasonably claimed that the parties to this contract intended by the charter-party provision, "The master shall sign bills of lading as presented," that he should give a written acknowledgment that he had received lumber on board of his ship for transportation which he had not in fact received?   Can such claim be made in the face of that clause of the charter party which provides that bills of lading are to be binding upon the master and owners as proof of the quantity delivered to the ship?   For the bills are not to be mere prima facie evidence, subject to be rebutted by the master in case of dispute; not merely the medium by which the quantity delivered to the ship is to be prima facie established,—but they are to be conclusive evidence against master and owners as to the quantity received. Such a construction of the charter party as would compel the master to sign erroneous bills of lading is illiberal, unreasonable, and unjust, and one not, in my opinion, agreeable to the real intention of the parties.   I think the true construction is that the master shall sign all true bills of lading correct as to the recital of facts therein as presented.   If he signs bills of lading at all, he must sign them as presented, without any indorsement impairing their value or negotiability.   If they are not true,—not correct in point of fact,—he should refuse to sign them.   He does so, however, subject to liability for wrongful refusal.   The master's refusal to sign the bills of lading as presented was no breach of the charter party if the quantity of lumber specified therein had not been received by him.   But he took the responsibility and risk of such refusal; and if, as a matter of fact, that quantity had been received, his refusal to sign the bills of lading, however honest he may have been in it, was a wrongful refusal, and gave a right to the shippers to recover damages, if any could be shown; or, if the ship had sailed away without giving any bills of lading, it would have been liable to a suit for conversion.   It makes no difference, so far as the shippers' right of action is concerned, whether the master refused to sign any bills at all or signed them, under the libelant's protest, with an indorsement which impaired their negotiability or value.

This brings us to the question whether the quantity of lumber specified in the bills of lading presented by the shippers was

actually received by the ship. The burden is on the libelants to show this. In the state of the proof on the subject I am unable to say that they have done so. From the testimony of libelants' witness Chandler it appears that he loaded 28 cars with lumber for them at a mill some 60 miles from Mobile, and whither they were brought. A copy of the specifications made by him is in evidence, and which specifications show an aggregate of 27,234 pieces. Pradoss, another witness for libelants, testified that he loaded 2 cars for the "Tongoy," and they aggregated 3,371 pieces; making a total as loaded at said mill of 30,605 pieces. Neither of these witnesses had any personal knowledge that the lumber they put on the cars at the mill was actually received by the ship. The mate of the ship is the only witness who testifies positively to the number of cars bringing lumber to the ship, and he gives the number of each car, and the number of pieces of lumber which he received on board the ship from each car. The number of pieces of lumber he claims to have received is 27,911. His testimony shows 26 cars corresponding in their numbers with numbers found in Chandler's specifications, and 4 cars with numbers that do not correspond with any of said specifications. Two of the last cars, I take it, were those loaded by Pradoss. But Chandler's specifications give the number of one car that does not appear from the master's testimony to have been received at the ship. There is no direct evidence accounting for this car, and I cannot find that it ever reached the vessel. The shippers were loading other vessels with lumber at the same time in the port of Mobile. The number of pieces of lumber claimed by the bill of lading to have been delivered to the ship "Tongoy," and for which the master was requested to receipt, is 29,686. The number claimed to have been loaded on the cars at the mill, and shipped to Mobile for her, is 30,605, nearly 1,000 pieces more than shown by the bill of lading, and the number claimed by the ship to have been received is 27,911 pieces, or 1,775 pieces less than shown by the bill of lading. In this condition of the evidence I am unable to find what the truth is. I must therefore hold that the libelants have failed to discharge the burden resting on them to show, at least by a preponderance of evidence, that the vessel did receive as her cargo 29,686 pieces of deals and boards, as they have averred in their libel. The libelants have not made a case which entitles them to damages, if any had been shown. The libel must be dismissed; and it is so ordered.