4189. McINTYRE BROTHERS & COMPANY *v.* SOUTH ATLANTIC STEAMSHIP LINE.

1. When it affirmatively appears that the cargo specified in a bill of lading was never delivered to the carrier or received by it, the original consignee in the bill of lading can not hold the carrier liable for the loss of the cargo, unless it appears that the bill of lading was issued with an intent to defraud.

2. It is the duty of the master of a vessel, who is a servant of the ship-owner, to ascertain whether articles receipted for by him in a bill of lading have been actually received for shipment; and if, by reason of his neglect to perform his duty in this respect, loss is incurred by the ship-owner, the latter can not recover therefor from a charterer of the ship, although the charter-party stipulates that the captain shall sign the bills of lading "as and when presented by the charterer," when this stipulation is so qualified as to restrict the general authority of the captain to the matter of freight rates, and no specific authority is given him to warrant the correctness of the bills of lading in other respects. Generally an agent of a ship-owner has no authority to sign bills of lading for cargo which has not been delivered to the ship for transportation.

3. Payment of the debt of another, without his request or authority, does not entitle the payer to recover from the debtor the sum thus advanced.

4. A petition which in substance alleges that the plaintiff has a right of action over against the defendant for moneys which the plaintiff was

legally required to pay, on account of the misrepresentations of the defendant, can not be amended by setting up a cause of action dependent upon a specific breach of a contract between the parties which would have entitled the plaintiff to recover damages for the breach.

DECIDED FEBRUARY 24, 1913.

Complaint; from city court of Savannah—Judge Davis Freeman. March 20, 1912.

McIntyre Brothers & Company (the plaintiffs), as ship-owners, entered into a charter-party with the South Atlantic Steamship Line (the defendant) as a charterer, by the terms of which the plaintiffs' steamship "Reliance" was to be loaded by the defendant with a cargo to be provided by the defendant at Savannah, Georgia, and carried by the said steamship to Havre and Hamburg. The contract provided that the captain "shall sign bills of lading as and when presented," without prejudice to the contract. In pursuance of that contract the defendant presented to the captain of the said steamship, for his signature, certain bills of lading calling for thirty-six bales of cotton of specified marks set forth in the bills of lading, consigned to parties named in the petition as amended; also bills of lading for six pieces of wood and for three barrels of rosin, described in the petition as amended. These bills of lading were signed by the master as required by the contract or charter-party, and it is alleged that they were signed upon a representation of the defendant, upon which representation the captain of the said steamship relied, that the cargo specified in them had been loaded on the said steamship by the defendant as required by the contract. On arrival of the ship at Havre it was found that the cotton so marked and consigned had not been loaded on it by the defendant at Savannah, and the owners of the ship paid the consignees for the missing cotton. On arrival of the ship at Hamburg it was found that four pieces of the oak described and consigned had not been loaded at Savannah by the defendant, and the ship-owners paid the consignees their value. It was also found, on arrival at Hamburg, that three barrels of rosin consigned had not been loaded by the defendant at Savannah, and the consignees of this rosin required the ship-owners to pay the value thereof. Certain other cargo was found on board the ship, put there at Savannah by the defendant, bearing no mark appearing on the manifest, and for which there were no consignees. The plaintiffs endeavored to get the consignees of the missing cotton to accept

the no-mark and wrong-marked bales of cotton in lieu of the cotton marked as consigned to them, but this the consignees refused to do. The plaintiffs thereupon sold the no-mark and wrong-marked cotton, and obtained the best price obtainable therefor, and gave credit to the defendant for the amount received, less the necessary costs and expenses incident to the transaction. This suit was brought to recover the difference in money claimed to be due in consequence. The court below, on demurrer, held that neither the original petition nor the petition as amended presented a cause of action, and dismissed the suit.

*Anderson, Cann & Cann,* for plaintiffs.

*Adams & Adams,* for defendant.

RUSSELL, J. (After stating the foregoing facts.)

Stripped of the many collateral questions which have been presented in the exhaustive briefs of the very learned counsel for both parties, the solution of the question as to whether the defendant is liable to the plaintiffs depends at last upon the construction of the contract by which they are bound, and which we think the lower court properly construed. The case is not affected by rulings, almost without number, which we have examined, where the charter-party differed from the one involved in this case. A charter-party, after all, is nothing more than a contract of affreightment, and though the contract be unusual, or even unnaturally favorable to one of the contracting parties rather than to the other, this affords no reason why the contract as written should not be enforced. Briefly stated, and putting the case most favorably for the plaintiffs, they seek to recover money which they paid in Europe, to consignees, for a portion of the cargo which they were unable to deliver, because, upon the ship's arrival, that portion of the cargo could not be found in the ship. The defendant contends that it is not liable, and that the plaintiffs have no right of action over against it, because the plaintiffs were not compelled to pay the consignees, and also because, if they were liable to the consignees in Europe, this liability was due to some other cause than a breach of the defendant's contract as embodied in the charter-party; in other words, that even if the plaintiffs were liable to pay the consignees, it was not due to any fault of the defendant.

The merit of these respective contentions is to be determined by the nature of the agreement between the parties and the relations

26

they sustained to each other. It does not matter that under the provisions of a "time-charter," such as is dealt with in the Santona case, 152 Fed. 516, or in Golcar Steamship Co. *v.* Tweedie Trading Co., 146 Fed. 563, or in the case of the Steamship Hackney (which is appended in a note to the Santona case), it was held that the captain was the servant of the charterer. These were cases in which the contract was treated as a demise of the ship, and, as Judge Hough says in the Santona case: "The rule of law separating the letting of a ship from a contract for her services has been too often laid down to admit of doubt." Nor does it matter that courts of highest authority (as in Elder, Dempster & Co. *v.* Dunn & Co., decided by the House of Lords, Law Times, Dec. 18, 1909, 11 Aspinall's Maritime Law Cases (N. S.) 337) have held that under a particular contract therein involved, the carrier could recover from the charterer the damages he had to pay for short delivery. We are only concerned with the contract entered into between the plaintiffs and the defendant. As we construe that contract, the charterers were to furnish the cargo alongside the ship, and pay for loading it on board the ship, and McIntyre Brothers & Co. were to transport it to destination and deliver it to the charterers' agents. It is alleged in the petition that a certain portion of the cargo, the value of which the plaintiffs paid the consignees, and which it was the defendant's duty to place alongside the ship, was not placed alongside the ship, and that in consequence of its not being aboard when the ship reached its destination, the plaintiffs had to pay the consignees for it. If nothing more was stated, this would seem to give the plaintiffs a clear right of action, but it appears from the petition that the only reason why the plaintiffs had to pay the consignees for the shortage in the cargo was that the consignees had bills of lading which included the missing cotton, lumber, and rosin. And this raises the inquiry as to the plaintiffs' original liability to the consignees upon their bills of lading. Could the plaintiffs have refused to pay the consignees for the portion of the cargo they failed to deliver? And if not, would they have a right over against the defendant to recover the amount that they were compelled to pay? We think the first question must be answered in the affirmative, and the second in the negative.

It is not necessary to determine the question of the plaintiffs' liability if the bills of lading had been assigned and had passed into

the hands of innocent purchasers without notice, because there is no allegation that they were assigned; and consequently such rulings as that in Van Santon v. S. O. Co., 81 N. Y. 171, are not in point. Construing the petition most strongly against the pleader, it must be assumed that the bills of lading had not been assigned, but were presented by the original consignees. Still, even if the plaintiffs were liable upon their bills of lading, the defendant, whose duty in reference to the cargo was to place it alongside the ship, would not be liable upon the bills of lading, because they were issued by the captain, who must be held to be the agent of the plaintiffs themselves, and no responsibility would attach to the defendant for an act of the captain as an agent of the plaintiffs. This contract expressly limits the liability of the defendant to the period of time necessary to put the cargo on board. It contains the stipulation: "Owners to be responsible for all cargo after it is delivered alongside, and signed for by mate or other person authorized to receive same." And paragraph 11 of the charter-party provides that "All liability whatever of the charterers hereunder is to cease when the cargo is shipped, the owners, master, or his agents having an absolute lien on it for freight, dead freight, and demurrage." These provisions may seem unreasonable, but they speak the agreement of the parties. It does not appear that the portion of the cargo which was missing, even if not loaded by the stevedores, was not stolen or misplaced after it was placed alongside the ship by the charterers. The petition, therefore, does not show that the failure of the charterers to place alongside, or load, all of the cargo imposed liability upon the charterers.

The plaintiffs rely upon the proposition that McIntyre Brothers & Company were liable to the consignees because they could not dispute the statement of the bills of lading in the hands of the consignees that they had received the shipment, including the portion which they (the owners of the vessel) were unable to deliver. There is no stipulation that the bills of lading are to be binding upon master and owners as proof of quantity delivered to the ship (as there was in the Tongoy case, 55 Fed. 329); and so we need not consider whether the plaintiffs would have been estopped to deny the acknowledgments of their bills of lading, if the present contract had contained such a stipulation. The question turns upon whether the master had the authority to sign bills of lading

for a shipment which he had not in fact received. The plaintiffs' petition states that the missing articles were not loaded. Therefore, of course, if the master acknowledged the receipt of these articles, the statement that he had received them was untrue. The plaintiffs attempt to meet this point by an allegation that the charterers procured the signature of the master to the bills of lading by false representations. This might give the plaintiffs a right of action for deceit, if by such false representations the plaintiffs had finally been compelled to pay the consignees. The fact that the bills of lading were induced by misrepresentation, however, would not necessarily have made the plaintiffs liable to pay the consignees for the shortage in the cargo. At the time that the plaintiffs paid the claim of the consignees they were not estopped from asserting that the master had no authority to sign in their behalf bills of lading for a shipment which, in fact, had never been received by them.

In Sears *v.* Wingate, 3 Allen (Mass.), 103, Judge Hoar, delivering the opinion of the court, held it to be a general principle, amply supported by authority (which he cites), that "It is not within the scope of the master's authority from the owners to sign bills of lading for any property but such as is put on board." Counsel for the plaintiffs concede the general principle, but insist that in the present case, under the provision of the contract that "the captain shall sign bills of lading as and when presented on press receipts or railroad guarantees, as customary," the captain not only had the authority to sign the bills of lading, but it was his duty to do so without question. This view is supported with marked ability in the learned and ingenious argument of counsel, and many authorities are cited. We think, however, counsel loses sight of the fact that the provision in reference to the captain signing the bills of lading "as and when presented" is qualified by the stipulation that they must be signed "without prejudice to this charter-party," and also that the entire authority of the captain in signing the bills of lading is restricted to the matter of freight-rates. Since the charterers were responsible only for the cargo, in placing it alongside the ship and in loading what there might be to load, and their responsibility ceased (under paragraph 11) when the cargo was shipped (or loaded), authority of the captain to acknowledge receipt of cargo which in fact he did not receive

can not be implied from the contract. And it has been expressly held that the terms in a charter-party authorizing the captain to sign bills of lading "as and when presented, without prejudice to the charter-party," "but any difference between the amount of freight as per bills of lading and this charter-party to be settled at port of loading," etc., were not inconsistent with the general rule that an agent can not give bills of lading for shipments not received, but confined the authority of the captain, in relation to the bills of lading, to the mere matter of freight charges. 36 Cyc. 65-66; The Tongoy, 55 Fed. 330; The Kirkhill, 99 Fed. 576.

The petition in the case at bar is based upon the alleged violation of the charter-party. "Petitioners attach hereto an itemized statement marked exhibit B, which is made a part hereof, showing that said defendant is indebted to them in the sum of 196 pounds sterling, 9 shillings, and 11 pence, for which amount in terms of money of the United States of America, to wit, the sum of nine hundred and fifty-one 11/100 dollars, petitioners, who are the owners of said ship Reliance, and who have paid out the sums heretofore set forth, because of defendant's breaches of contract as aforesaid, ask judgment." But in the allegations there is nothing to show that the charter-party was violated in any respect, nor is there any reference to a particular part of it which has been violated. The case proceeds upon the theory that the master signed the bills of lading upon the defendant's representation that the cargo described in the bills of lading had been loaded, when, as a matter of fact, it had not been loaded; but there is no allegation of any fraud on the part of the defendant. It is not stated that the defendant knew, at the time the bills of lading were presented for signature, that the missing cotton and other articles had not been loaded, nor is it alleged that there was any fraudulent collusion between the defendant and the master with intent to defraud the plaintiffs. It is to be noted, too, that while the charterers were to pay the stevedores for loading the cargo, the loading was to be under the captain's direction. He was to say in what portion of the ship the various articles of freight were to be stowed, and there is no reason given why he could not, or did not, check the articles as delivered upon and stowed in the ship, except the fact that the charterers loaded the ship in great haste in order to make the despatch money. This statement itself would contradict the idea

that the defendant was intending to defraud the plaintiffs, and raise the inference that if the defendant omitted to place alongside or load any portion of the cargo, it was due to haste and negligence rather than to design.

Counsel for the plaintiffs strenuously insist that the ruling in Elder-Dempster & Co. *v.* Dunn & Co., supra, is conclusive upon the point that McIntyre Brothers & Company could not dispute the statements of the bills of lading, and therefore were liable to the consignees. As we have previously said, we see no reason why McIntyre Brothers & Company could be held to be estopped from denying the authority of the captain to sign the bills of lading for cargo not received; but even if the liability for payment of the consignees properly rested upon the South Atlantic Steamship Company, McIntyre Brothers & Company would not have a right to recover for the payment made by them in behalf of the South Atlantic Steamship Company, unless they had been requested by the steamship company to pay its debt. The fact that I, without Smith's request, pay Smith's debt, does not authorize me to recover from Smith the amount which I paid in behalf of Smith without his procurement or knowledge. Smith may justly owe the debt; non constat that he is ready and willing to pay it. It may be it would have been tedious and expensive to the plaintiffs to have resisted a libel if the consignees had proceeded against the ship, but if the plaintiffs were not liable, and these expenses had been caused by the defendant, they could have recovered from the defendant the damages which the defendant's breach of the contract had occasioned.

It appears that the provisions of the charter-party in the Elder-Dempster case are so dissimilar to the charter here involved that the ruling is not in point. The charter in that case was what is called the "net form," under which the charterer and his servants put the goods right on board, whereas in the charter before us the shipper gave the goods to the ship "alongside;" the owners were responsible for them while they remained there, and, though the charterers furnished the stevedores and paid for the loading, the loading was done under the supervision of the captain. We think that when the parties inserted in the present contract the stipulation that the owners were to be responsible for the cargo after it was delivered alongside, and signed for by the mate or other person

authorized to receive it, the ship-owners either clearly overlooked the fact that a part of the cargo might be stolen, burned, or removed from alongside the ship before it was loaded, or else they clearly intended to assume the risk in case of either of these contingencies; and in the absence of any evidence that the charter in the Elder-Dempster case contained a similar stipulation, we would not be authorized to treat the ruling in that case as controlling authority.

The liability of the defendant, if any, depends upon the authority of the captain to issue bills of lading for a cargo, which he did not receive. It must be conceded that a captain has, generally, no such authority, and there is nothing stated in the petition which would have given the consignee the right to assume that he did have such authority. Consequently the consignees took the bills of lading with knowledge of the fact that the captain had no such authority, and they could not have held McIntyre Brothers & Company liable for the portion of the cargo which was missing, without first proving that McIntyre Brothers & Company did in fact receive the entire cargo. As McIntyre Brothers & Company would not have been responsible in the first instance, they were not authorized to pay the consignees' claim against the South Atlantic Steamship Company; and, having paid it without direction or request on the part of the South Atlantic Steamship Company, they can not recover.

It may be that the bills of lading themselves would show that the South Atlantic Steamship Company was liable. But we can not assume this. We would have preferred that the bills of lading had been in the record. The defendant demurred upon the ground that they should be set forth, but does not except to the judgment overruling this demurrer, and, so far as this case is concerned, it must be held that the court ruled correctly in overruling the demurrer. We incline to the opinion that the ruling was right, and that there was no ground to except; but certainly the plaintiffs can not complain of the ruling, and, from their failure to amend by setting out the bills of lading (although they were not required to do so), it may be presumed that there is nothing in the bills of lading which would disclose anything to their benefit or take the case out of the general rule. It may be that the bills of lading did not disclose that the thirty-six bales of cotton were actually included therein, and the same may be said as to the

rosin and lumber. From this it may be inferred that business considerations may have influenced McIntyre Brothers & Company to accede to a claim which in fact was not justified by the bills of lading. The description of the marks of some portion of the cotton may have been illegible on the bills of lading, and the plaintiffs may have conceded the claim of the consignees too readily, simply to avoid litigation. Be this as it may, since the plaintiffs elected to base their action upon the charter-party, their case must stand or fall upon its provisions.

The fact that it is alleged in an amendment, which the plaintiffs proposed to make the seventh count of their petition, but which the trial judge refused to allow as an amendment, that the defendant failed to place the portion of the cargo for which the plaintiffs had to pay alongside the ship, as it was bound to do by the provisions of the charter-party, has been the subject of our most serious consideration, and the question presented has not been determined without great difficulty. We were at first of the opinion that this raised such an issue of fact, as to a very apparent breach of one of the conditions of the contract, that it should have been submitted to the jury, and that the trial judge erred in sustaining the objection to the amendment and in refusing to allow it. However, after an exhaustive examination of the authorities, we are compelled to the conclusion that this breach of the contract can not afford a basis for the plaintiffs' recovery of the sum of money which they allege they paid to the consignees upon their bills of lading, procured, as the plaintiffs allege, by false representations of the defendant to the captain that the goods had been placed alongside the ship. Even though the plaintiffs might be entitled to recover in a direct action brought upon the breach of the contract in this particular, and without regard to the bills of lading or the representations by which their issuance was induced, if the rule is as we think it is, and as stated by Justice Hoar in the case of Sears *v.* Wingate, supra, that the master never has authority to acknowledge receipt of goods which he does not actually receive; and if it is further true, as held in *Swift* v. *Tatner,* 89 *Ga.* 660 (15 S. E. 842), that the master, under this charter-party, was the servant of the owner rather than the charterer, then the shortage in the cargo was the fault of the plaintiffs' own agent; and, of course, the plaintiffs could not recover from the defendant for a loss which had been

·occasioned the plaintiffs by the negligence of their own agent in not ascertaining that the goods specified in his bills of lading' had not in fact been delivered alongside. If, as a matter of fact, the goods were not delivered 'alongside by the defendant charterer, the plaintiffs may maintain an action for this breach of the contract; and the measure of their damages would not only include the market value at Savannah of such articles as were not put alongside, but might also include all other costs and damages to which the plaintiffs were subjected by reason of the defendant's breach of the contract evidenced by the charter-party. But this right of action would be one entirely different and distinct from the plaintiffs' original cause of action, which depends upon the procurement of bills of lading from the plaintiffs' captain by false representation to the effect that defendant had placed alongside the ship articles which had not in fact been delivered by the charterers. Of course, if, as a matter of law, the captain was the agent of the charterers, instead of the agent of the owners of the ship, the plaintiffs would not have been compelled to pay the consignees for the shortage in the cargo. We think, therefore, that under the allegations of the petition, as well as of the amendments proposed thereto, the plaintiffs could not recover of the defendant in this action.

Even if it is not clear that the plaintiffs could have avoided paying the consignees in Europe, it is perfectly plain, in the absence of any allegation of fraud or collusion between the captain and the defendant charterers, that the failure of the captain (the plaintiffs' agent) to ascertain for himself and for the protection of his masters that the articles receipted for in the bills of lading had been actually delivered by the charterers was the real cause of the shortage for which the plaintiffs had to pay, and that the plaintiffs can not recover of the defendant for the negligence of their own agent.

*Judgment affirmed.*